# Illinois Official Reports

## Appellate Court

---

## *In re Marriage of Rogers*, 2015 IL App (4th) 140765

---

| | |
|---|---|
| Appellate Court Caption | In re: MARRIAGE OF LAUREN ROGERS, n/k/a LAUREN BEAUDETTE, Petitioner-Appellant, and TERRY ROGERS, Respondent-Appellee. |
| District & No. | Fourth District<br>Docket No. 4-14-0765 |
| Filed | January 26, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a custody dispute where the mother of the parties' child claimed that custody could be modified only when the changed circumstances have already harmed or affected the welfare of the child, the trial court properly determined that it was not required to wait until something happened to the parties' child before it could modify custody, and when respondent identified changes in petitioner's circumstances, including the emergence of mental health issues, a troubled and sometimes violent relationship between petitioner and her new husband, instances of reckless and neglectful parenting by petitioner, and petitioner's unwillingness to be truthful and forthcoming with respondent about important matters affecting their child, the trial court, pursuant to granting respondent's motion to reconsider the earlier denial of his petition for modification, properly granted his motion based on the conclusion that the trial court's earlier denial improperly required respondent to show that the child's welfare was adversely affected or harmed by petitioner's acts and conduct, rather than considering the factors relevant to the child's best interest with respect to modification. |
| Decision Under Review | Appeal from the Circuit Court of Edgar County, No. 09-D-2; the Hon. Steven L. Garst, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| Counsel on Appeal | John C. Vojta (argued), of Law Offices of John C. Vojta, of Palatine, for appellant. |
| | Brent D. Holmes and Thomas A. Drysdale (argued), both of Heller, Holmes & Associates, P.C., of Mattoon, for appellee. |
| Panel | JUSTICE STEIGMANN delivered the judgment of the court, with opinion. Presiding Justice Pope and Justice Appleton concurred in the judgment and opinion. |

## OPINION

¶ 1 In January 2009, petitioner, Lauren Rogers–now known as Lauren Beaudette–filed for dissolution of marriage from respondent, Terry Rogers. In March 2009, the trial court entered a judgment (1) dissolving the parties' marriage; (2) awarding petitioner custody of the parties' son, B.R. (born May 13, 2008); and (3) awarding respondent reasonable visitation. In February 2012, respondent filed a motion to modify custody pursuant to section 610(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/610(b) (West 2012)), alleging that (1) a change in circumstances occurred and (2) it was in B.R.'s best interest to be placed in respondent's custody. In March 2014, following a six-day bench trial, the court denied respondent's motion.

¶ 2 In April 2014, respondent filed a motion to reconsider, arguing that the trial court applied an incorrect legal standard in denying his motion to modify custody. Specifically, respondent contended that the court improperly required him to prove that petitioner's acts and conduct harmed B.R.'s welfare. In July 2014, the court granted respondent's motion to reconsider, concluding that its original ruling erroneously "placed an additional burden on [respondent] to show that the welfare of the child was adversely affected or harmed by the acts and conduct of [petitioner] rather than considering the factors for the best interest of the child for modification." Thereafter, the court transferred custody of B.R. to respondent.

¶ 3 Petitioner appeals, arguing that the trial court erred by granting respondent's motion to modify custody because respondent failed to prove that the change in circumstances adversely affected B.R.'s welfare. We disagree and affirm.

¶ 4                           I. BACKGROUND

¶ 5      The following pertinent facts were gleaned from the parties' pleadings, exhibits, and evidence presented at the trial.

¶ 6             A. Events Preceding Respondent's Motion To Modify Custody

¶ 7      In January 2008, petitioner and respondent–then 24 and 31 years old, respectively–married in the Bahamas. The couple's only child, B.R., was born in May 2008. In January 2009, petitioner filed her petition for dissolution of marriage, which the trial court granted in March 2009. As part of its dissolution judgment, the court ratified the parties' settlement agreement, which awarded custody of B.R. to petitioner and granted respondent reasonable visitation. The settlement agreement further provided that if either party moved more than one hour away from the other party, child visitation and sharing of transportation would be revisited.

¶ 8      In the summer of 2009, petitioner and respondent filed separate motions to modify visitation, both asserting that petitioner moved from Paris, Illinois–where she had lived with B.R. and respondent during the marriage–to Naperville, Illinois. In January 2010, the trial court entered an order modifying visitation, which (1) provided alternate-weekend visitation for respondent and (2) required the parties to meet in Gilman, Illinois, to transfer custody of B.R.

¶ 9                 B. Respondent's Motion To Modify Custody

¶ 10      In February 2012, respondent filed his motion to modify custody, which he amended in June 2012 and again in August 2013. Respondent's final amended motion alleged that a substantial change in circumstances had occurred pertaining to petitioner and B.R., which rendered it in B.R.'s best interest that custody be transferred to respondent.

¶ 11                    C. Evidence Presented at Trial

¶ 12      The parties presented the following pertinent evidence at trial, which took place over six days in January and February 2014. We note that the six-volume trial transcript consists of lengthy testimony from 15 different witnesses, and the trial record includes voluminous documentary exhibits. In the interest of clarity, we summarize only the evidence pertinent to our resolution of this appeal.

¶ 13           1. *Petitioner's Postdivorce Life in the Chicago Suburbs*

¶ 14      In July 2009, petitioner moved from Paris to her sister's home in Naperville, where she began a full-time position at a video-rental store. In October 2009, petitioner quit her job at the video store to work at the day care center that B.R. attended. Petitioner worked at this day care center until March or April 2010.

¶ 15      In June 2010, petitioner married Shawn Beaudette, who at that time was an insurance salesman for Liberty Mutual. The couple moved into a townhouse in Naperville and petitioner began working part-time at a bar and grill. In August 2010, the family moved into a house in Aurora. In October 2010, petitioner quit her job at the bar and grill and began working for a social-service provider for adults with mental illnesses, where she stayed until March 2011. From March 2011 until April 2013, petitioner operated an unlicensed day care business out of

her home. Thereafter, petitioner and Shawn moved to a house in Oswego and petitioner became a stay-at-home mother.

¶ 16                                    2. *The July 2010 Handgun Incident*

¶ 17        Petitioner and Shawn spent the evening of July 24, 2010, drinking with friends and celebrating Shawn's thirty-sixth birthday. Sometime after midnight, the couple got into a dispute after Shawn discovered text messages on petitioner's phone in which petitioner's former video-store coworker told petitioner that he "wanted to hug and kiss her." According to petitioner's statements to police, Shawn pushed petitioner down onto the couple's bed. Petitioner told Shawn that if he did not leave her alone, she was going to get her handgun. After hearing this statement, Shawn went to the bedroom closet to retrieve and unload petitioner's gun. Shawn knew that the gun was loaded because during the previous night, petitioner loaded it and walked around the outside of the townhouse after she thought she heard a noise. While trying to unload petitioner's gun, Shawn accidentally fired a bullet into the couple's bed. At the time, B.R. was sleeping in his room, one floor below the couple's bedroom. Officer Robert Carlson of the Naperville police department testified that if the gun had been aimed differently, the .40-caliber bullet could have gone through the floor into B.R.'s room. Although Shawn and petitioner testified that B.R. was sleeping during the incident, neither of them went into B.R.'s room to check on him.

¶ 18        After the shot was fired, Shawn left the townhouse on foot and went to a hotel in the nearby town of Lisle, where he intended to spend the night. At 2:48 a.m.–roughly 45 minutes after the shot was fired–petitioner called the police to report the incident. (Petitioner waited so long to call the police because she was worried about jeopardizing her hopes of a future career in law enforcement. Petitioner's friends finally convinced her to call the police because of the danger posed to B.R.) Police eventually located and arrested Shawn, who was subsequently charged with domestic battery and several firearm-related offenses. Several days later, when a social-services representative of the Naperville police department called petitioner to follow up on the incident, petitioner denied that any domestic dispute had occurred. In July 2011, pursuant to a negotiated plea agreement, Shawn pleaded guilty to misdemeanor battery and was sentenced to one year of court supervision and ordered to complete a domestic-violence program.

¶ 19        As a result of the handgun incident, the couple's landlord ordered them to vacate the townhouse. Officer Carlson admitted that, with hindsight, he believed the police should have reported the incident to the Department of Children and Family Services (DCFS). Petitioner never told respondent about the shooting. Respondent first learned about the incident more than 1½ years later, when he conducted an Internet search for Shawn's name, which yielded a newspaper story about the event.

¶ 20                                    3. *The September 2012 Drunk-Driving Incident*

¶ 21        Sergeant Jacob Stransky of the Montgomery police department testified that on the evening of September 4, 2012, he responded to a report of a car "weaving in and out of the roadway into oncoming traffic." Stransky located the car, which petitioner was driving, and conducted a traffic stop on Illinois Route 30, just south of Aurora. Stransky smelled alcohol and petitioner admitted to him that she had been drinking. Officer Mike Mrozek of the Kendall

County sheriff's office arrived at the scene and administered a portable breath test, which recorded petitioner's blood-alcohol concentration at 0.12. Instead of charging petitioner with driving under the influence of alcohol (DUI), however, Stransky gave petitioner a ride home and allowed her to leave her car on the side of the road.

¶ 22 Shawn testified that petitioner arrived home on the evening of September 4, 2012, and reported that she left her car on the side of the road because it was having mechanical trouble. Shawn retrieved the car later that night, but he did not notice any mechanical problems. (It was not until the trial on respondent's motion to modify custody that Shawn learned petitioner had been investigated for DUI.) According to Shawn, petitioner consumes alcohol three or four times per month. He denied that she has a drinking problem.

¶ 23 In her trial testimony, petitioner denied (1) drinking prior to the traffic stop or (2) admitting to Stransky that she had been drinking. She explained that her erratic driving occurred because she was trying to configure her Bluetooth headset–a fact that she purportedly admitted to Shawn several months after the incident. Petitioner claimed that she waited several months to admit this truth to Shawn because she had promised him that she would not adjust her Bluetooth headset while driving, and she was "embarrassed" that she did not follow through with that promise.

¶ 24 4. *Petitioner's First Psychotic Episode*

¶ 25 Katan Hertzberg, an emergency-room nurse at Riverside Medical Center in Kankakee, testified that at 2 a.m. on March 21, 2013, B.R.–who was four years old at the time–wandered into the emergency room and told a staff member that his mother had left him in the car alone. Security personnel found petitioner inside a bathroom in the hospital. When hospital staff asked petitioner why she left B.R. alone in the car, petitioner denied doing so, explaining that she left him with a group of people who were playing a game in which "they go invisible." Petitioner further explained to Hertzberg that she had been driving from her home in Aurora to her parents' house in Kankakee and she stopped at the emergency room simply to use the bathroom. Hospital security workers reviewed surveillance video and confirmed that petitioner had left B.R. alone in the car while she went inside the hospital.

¶ 26 To prove to Hertzberg that invisible people were in her car, petitioner made a phone call to her sister-in-law, who she claimed was one of the invisible people. Upon receiving the phone call, petitioner's sister-in-law contacted Shawn, who contacted Hertzberg. Shawn had been asleep at the couple's home in Aurora, and he told Hertzberg that petitioner had recently started taking medication for abdominal pain, which caused her to hallucinate. Shawn told Hertzberg that several hours before petitioner arrived in the Kankakee emergency room, she had been hallucinating and told him that she was leaving the house to stay in a hotel.

¶ 27 Hertzberg decided that she should report the incident to DCFS, but her supervising doctor told her not to because it was an "isolated incident." Later in the morning, the hospital released B.R. to petitioner's parents, who lived in the Kankakee area. B.R. stayed with petitioner's parents until later that day, when they brought him to Gilman for a visitation exchange with respondent. No one told respondent that petitioner or B.R. had been in the hospital. Shawn drove from Aurora to Kankakee to bring petitioner home. Upon petitioner's discharge, the hospital directed her to follow up with her primary-care physician. Petitioner never did so.

¶ 28     Respondent first learned that B.R. had been in the emergency room after receiving an explanation of benefits from his insurance company. When respondent asked petitioner why B.R. was at the emergency room at 2 a.m., petitioner explained that B.R. had been "super sick," with a fever and vomiting. When respondent asked why B.R. had not been given medication, petitioner said that hospital staff gave B.R. a pill and a shot but nothing more. Later, after respondent learned the truth about the hospital visit from additional records he requested, he called DCFS to initiate an investigation.

¶ 29     In June 2013, Gail Mastio, a DCFS caseworker, interviewed petitioner, who stated that on March 20, 2013, she was staying with B.R. at her parents' house in Kankakee, when she began feeling ill. Petitioner told Mastio that she went to the Kankakee emergency room at 10 p.m. with B.R. Petitioner denied driving to Kankakee from Aurora, hallucinating, or leaving B.R. in the car. A DCFS report made indicated findings of (1) an environment injurious to B.R.'s welfare and (2) inadequate supervision. However, DCFS did not take further protective action. Mastio recommended petitioner undergo a psychiatric evaluation, but petitioner never did so.

¶ 30     In her trial testimony, petitioner stated that she had taken B.R. to her parents' home in Kankakee on the evening of March 20 or 21, 2013. While her parents were out getting a pizza, petitioner began feeling disoriented. She drove with B.R. to the emergency room, pulled up to the emergency-room doors, and carried B.R. inside. According to petitioner, when she arrived at the emergency room to seek help for her disorientation, a nurse began examining B.R. (the nurse told petitioner that it was "mandatory" that she do so). The nurse called petitioner's parents, who came to the hospital to retrieve B.R.

¶ 31                          5. *Petitioner's Second Psychotic Episode*

¶ 32     In the early morning hours of March 22, 2013–one day after petitioner's first psychotic episode–petitioner awoke believing that someone was inside the house. Shawn attempted to convince petitioner that she was imagining things. Shawn testified that he watched petitioner walk outside to the next-door neighbor's house and start pounding on the door and windows. Because Shawn was taking a court-ordered domestic-violence class as a result of his criminal conviction, he did not attempt to physically restrain petitioner for fear that such action would constitute a domestic battery.

¶ 33     According to Shawn, petitioner was attempting to go house to house to warn the neighbors that she had seen someone get killed. (A 9-1-1 call log admitted into evidence showed that the caller reported a person pounding on her door and yelling that she was going to kill the caller.) The neighbor never opened the door and Shawn was able to coax petitioner back inside. Shortly thereafter, however, several police officers arrived on the scene and petitioner continued to assert that she had seen someone get killed. The police called an ambulance, which arrived shortly after 3 a.m. and transported petitioner to Rush-Copley Medical Center for an evaluation. Petitioner was diagnosed with visual hallucinations. (Although records from Riverside Medical Center in Kankakee suggested that respondent's hallucinations might have been attributable to Bentyl–a medication she was taking for abdominal pain–records from petitioner's March 22, 2013, visit to Rush-Copley Medical Center indicated that petitioner had stopped taking that medication and "even with discontinuation of the Bentyl[,] symptoms have not resolved.") Petitioner was discharged with a recommendation to follow up with her primary-care physician. She never did so.

¶ 34                                6. *Petitioner's Home Day Care*

¶ 35     From March 2011 until approximately April 2013, petitioner operated her own day care business from her home. Petitioner never obtained a day care license because she knew that doing so would require her to install some form of security system in the back of her house.

¶ 36     Scott Vernard, a middle school teacher, testified that he and his wife placed their two children–ages three and five–in petitioner's care after finding petitioner's day care business through an Internet search. Petitioner indicated on her day care's Facebook page that she had previously worked for DCFS, which appealed to the Vernards. On April 16, 2013, Vernard's wife dropped her children off at petitioner's home shortly after 7 a.m. When Vernard went to retrieve the children at 4:30 p.m., he knocked on the door for approximately 5 to 10 minutes, receiving no answer. Eventually, his five-year-old son unlocked the door and let him inside. Vernard found petitioner "passed out" on a couch in the back of the house. After shaking petitioner, she finally woke up and answered her phone, which was ringing. Vernard noticed that petitioner's speech sounded "lispy or slurred" and she was not making any sense. Vernard's older child stated that he was hungry because all he had to eat was chips. The younger child, whom Vernard found upstairs in a crib, had soiled himself.

¶ 37     Vernard withdrew his children from petitioner's day care business and reported the incident to DCFS. Petitioner subsequently ignored Vernard's requests for an explanation of the incident. During the ensuing DCFS investigation into Vernard's complaint–which took place simultaneously with a DCFS investigation into petitioner's operation of an unlicensed day care business–petitioner told a DCFS investigator that she knew the rules regarding child care because she used to be a DCFS case manager.

¶ 38     At trial, petitioner denied outright Vernard's version of events, including the fact that she was lying down or sleeping. Petitioner testified that because she was changing a diaper in a back room of the house when Vernard knocked on the front door, she told one of the children to let Vernard inside. She yelled to Vernard but apparently he could not hear her. Petitioner acknowledged that Vernard was very upset during their interaction, but she provided no explanation as to why. She opined that Vernard made the phony DCFS report in retaliation for a dispute over day care payments. On cross-examination, petitioner also denied ever claiming that she worked for DCFS. Instead, she clarified that she was licensed by DCFS as a "child welfare worker."


¶ 39                              7. *Petitioner's Third Psychotic Episode*

¶ 40     Shawn testified that on Thursday, May 16, 2013, petitioner left the house to spend a weekend with some friends. Petitioner told Shawn that she was flying to Atlanta, Georgia, and planned to return on Saturday. Shortly after Shawn woke up on Friday morning, however, petitioner's sister called him to report that petitioner was in the hospital in Bolingbrook, Illinois. Instead of going to Atlanta, petitioner had spent Thursday afternoon and evening in Bolingbrook drinking with former coworkers from the video store. According to petitioner, she took some pain medication–the same medication she blamed for her previous psychotic episodes and hospitalizations–and began having delusions and hallucinations. Petitioner's friend, Jason, drove her to an urgent-care facility in Bolingbrook. Personnel at that facility called the police, who arrived and summoned an ambulance to transport petitioner to Adventist Bolingbrook Hospital.

¶ 41　　According to hospital records, petitioner stated that she was at the hospital as part of a proposal scheme by her boyfriend, which involved cooperation by police and ambulance personnel. Petitioner explained to a nurse that her boyfriend did not go through with the proposal because he found out that her divorce was not finalized. The records further detailed several specific hallucinations and delusions that petitioner experienced and discussed with medical staff, including her belief that her friends were using an iPhone app to make people invisible. Petitioner told the staff that this was her first psychiatric hospitalization. Upon her discharge, petitioner was provided with brochures entitled "Understanding Schizophrenia" and "Treating Schizophrenia." Medical staff advised petitioner to follow up with her primary-care provider. She never did so. Petitioner testified at trial that she did not need additional care because nothing was wrong with her.

¶ 42　　　　　　　　　　　　　　　　　　　　　8. *B.R.*

¶ 43　　By all accounts, B.R. remained a relatively well-adjusted child throughout the time period at issue in this case. However, respondent testified that B.R. was sick "half the time" he arrived for visits. Respondent concluded, based upon documents he received from his insurance company, that petitioner took B.R. to the doctor only when absolutely necessary.

¶ 44　　Respondent testified that petitioner "brainwashed" B.R. regarding his relationship with respondent. On several occasions, B.R. said to respondent, "You're the bad daddy. Shawn's the good daddy." B.R. also believed at times that he shared Shawn's last name. During a conversation with B.R. over speakerphone, respondent heard petitioner say to B.R., "tell your daddy he's worthless because he can't give us money." Respondent testified that petitioner often sounded intoxicated when she facilitated phone conversations between B.R. and respondent.

¶ 45　　　　　　　　　　　　　　　　　　　9. *Respondent*

¶ 46　　Respondent testified that he was an investigator with the City of Paris police department. At the time of the trial, he lived in a house with his girlfriend of three years, Callie, and her four-year-old daughter. Respondent and Callie intend to get married after these custody proceedings are resolved. Respondent has two daughters–ages 16 and 10 at the time of the trial–from previous relationships. The mothers of respondent's daughters both testified that they have a good relationship with respondent, who is a great father and actively involved in his children's lives.

¶ 47　　　　　　　　　　　　D. The Trial Court's March 2014 Order

¶ 48　　In March 2014, the trial court denied respondent's motion to modify custody. In a 17-page opinion order, the court stated–citing the Third District's decision in *In re Marriage of Nolte*, 241 Ill. App. 3d 320, 325-26, 609 N.E.2d 381, 385 (1993)–that "[c]hanged conditions alone do not warrant modification in a child custody judgment without finding that such changes affect the welfare of the children." Although the court noted that it had "great concern" about its decision and petitioner had "a credibility problem," the court ultimately concluded that respondent failed to meet his burden of proving that changed conditions affected B.R.'s welfare. The court based this determination on the absence of evidence that B.R. suffered any actual harm as a result of the changed circumstances.

## E. Respondent's April 2014 Motion To Reconsider

In April 2014, respondent filed a motion to reconsider, arguing that the trial court applied the incorrect legal standard. Specifically, respondent asserted that the court erroneously accepted petitioner's contention at closing arguments that for respondent to meet his burden of proof, he must establish that petitioner's acts and conduct affected or harmed B.R.'s welfare. Respondent contended that under the correct legal standard, he was required to prove merely that (1) a change in circumstances occurred and (2) modification of custody was necessary to serve B.R.'s best interest.

## F. The Trial Court's Order Upon Reconsideration

In July 2014, the trial court vacated its March 2014 order and entered a new order, transferring custody of B.R. to respondent. In granting respondent's motion to reconsider, the court explained that it (1) "gave too much emphasis" to language from *Nolte* in its original order and (2) "placed an additional burden on [respondent] to show that the welfare of the child was adversely affected or harmed by the acts and conduct of [petitioner] rather than considering the factors for the best interest of the child for modification." After reviewing the evidence under the best-interest factors set forth in section 602(a) of the Act (750 ILCS 5/602(a) (West 2012)), the court stated, in pertinent part, as follows:

> "In my initial opinion letter, I found that there did not seem to be an effect on [B.R.] I believe that I overstated that, and there is evidence that [B.R.] has been adversely affected. That [*sic*] fact that there was not an accident when [petitioner] drove from Aurora to Kankakee with the invisible people is fortuitous. [B.R.] was left unattended in the automobile and entered the hospital emergency room in the early morning hours of March 21[, 2013]. The children in [petitioner's] care were being neglected when Scott Vernard found [petitioner] asleep on her couch on April 16[, 2013]. One of those children was [B.R.] *** I do not believe you have to wait until something actually happens to [B.R.] to modify custody."

The trial court further explained that its previous finding–that petitioner had a credibility problem–was "an understatement." The court noted that petitioner lied to Shawn, respondent, and DCFS investigators, and that she must have lied during either her deposition or her trial testimony. The court also expressed "major concern" that petitioner never followed up with doctors after her repeated psychiatric hospitalizations. Based upon these and other factors, the court found that it was necessary to serve B.R.'s best interest that he be placed in respondent's custody.

This appeal followed.

## II. ANALYSIS

Petitioner argues that the trial court erred by granting respondent's motion to modify custody because respondent failed to prove that the change in circumstances adversely affected B.R.'s welfare. We disagree.

Section 610(b) of the Act provides, in pertinent part, as follows:

> "(b) The court shall not modify a prior custody judgment unless it finds by clear and convincing evidence, upon the basis of facts that have arisen since the prior judgment

or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian, *** and that the modification is necessary to serve the best interest of the child." 750 ILCS 5/610(b) (West 2012).

Under the plain language of this statute, the party seeking modification of custody must prove by clear and convincing evidence that (1) a change has occurred in the circumstances of the child or his custodian and (2) modification of custody is necessary to serve the best interest of the child. An important–and we think obvious–caveat to this rule is that the change in circumstances must be material to the child's best interest. In other words, "[c]hanged conditions alone do not warrant modification in custody without a finding that such changes affect the welfare of the child." *Nolte*, 241 Ill. App. 3d at 325-26, 609 N.E.2d at 385.

¶ 58    Petitioner construes the *Nolte* court's reference to "changes affect[ing] the welfare of the child" as allowing modification of custody only when changed circumstances *have already* harmed or affected the welfare of the child. In other words, petitioner contends that, regardless of the degree or nature of the change in circumstances, section 610(b) of the Act prohibits the trial court from modifying custody until those changes have resulted in actual harm to the child. This is an absurd interpretation of the statute.

¶ 59    In this case, the trial court was correct when it stated that it was not required to wait for something to happen to B.R. before it could modify custody. Indeed, this case demonstrates the statute operating as intended. Here, respondent identified changes in petitioner's circumstances–including, among other things, the emergence of (1) serious mental-health problems; (2) a relationship between petitioner and her new husband that was arguably troubled and, at times, violent; (3) instances of reckless and neglectful parenting by petitioner; and (4) an unwillingness by petitioner to be truthful and forthcoming with respondent about important matters affecting B.R. These changes clearly affected B.R.'s welfare insofar as they increased the risk of something bad happening to him. It was merely fortuitous that these changes in petitioner's life had not yet caused harm to B.R. Petitioner argues that section 610(b) of the Act required the court to stand by and wait for something bad to happen to B.R. before it could grant respondent's motion to modify custody. We reject that contention.

¶ 60    Section 610(b) of the Act allows a noncustodial parent, such as respondent in this case, to bring to the trial court's attention a change in circumstances and seek a reassessment of whether, in light of that change, modification of custody is necessary to serve the child's best interest. The *Nolte* court's reference to changes that "affect the welfare of the child" includes changes that have the potential to adversely affect the child, even if the child has yet to suffer the adverse effects of those changes.

¶ 61    Applying this principle to the trial court's judgment in this case, we first note that " '[t]he purpose of a motion to reconsider is to bring to the trial court's attention (1) newly discovered evidence not available at the time of the hearing, (2) changes in the law, or (3) *errors in the court's previous application of existing law*.' " (Emphasis added.) *Simmons v. Reichardt*, 406 Ill. App. 3d 317, 324, 943 N.E.2d 752, 758 (2010) (quoting *Stringer v. Packaging Corp. of America*, 351 Ill. App. 3d 1135, 1140, 815 N.E.2d 476, 481 (2004)). Here, the court acknowledged upon reconsideration that it originally misinterpreted section 610(b) of the Act to require proof that the change in circumstances had *already* adversely affected B.R. As we have explained, the statute allows the court to modify custody upon a showing that a change in circumstances has occurred which could lead to future harm or otherwise adversely affect the

child's welfare. Such preemptive judicial action falls comfortably within the court's authority to modify custody when "necessary to serve the best interest of the child." 750 ILCS 5/610(b) (West 2012). Accordingly, the court applied the correct legal standard upon reconsideration. Having so concluded, we turn to the court's ultimate judgment that modification of custody was necessary to serve B.R.'s best interest.

¶ 62 "Once the trial court has determined modification is required by clear and convincing evidence, the reviewing court will not disturb that decision unless it is contrary to the manifest weight of the evidence." *In re Marriage of Oros*, 256 Ill. App. 3d 167, 168, 627 N.E.2d 1246, 1248 (1994). As the court explained in its written order, the changes in petitioner's circumstances affected B.R.'s welfare in that they created an increased risk of harm. In particular, petitioner's mental-health problems raised serious concerns about her ability to safely parent B.R. without supervision. Petitioner blamed her psychotic episodes on medication that she was taking for abdominal pain. However, hospital records indicated that she had stopped taking that medication when she suffered her second psychotic episode. Even assuming her medication was to blame for all three psychotic episodes, she inexplicably chose to continue taking that medication after her first and second psychiatric hospitalizations. Perhaps most worrisome in terms of petitioner's custody of B.R. is the fact that she has never addressed her unquestionably serious mental-health issues with a professional.

¶ 63 In addition to petitioner's mental-health issues, the evidence disclosed instances of danger, neglect, and poor judgment that could have resulted in harm to B.R., but fortunately did not. We thoroughly discussed those instances in the background section of this order and we need not elaborate further. Suffice it to say, the trial court had ample opportunity over the course of the six-day trial to judge the credibility of the witnesses and assess the weight of the evidence. Based upon our thorough review of the record, the court's finding that modification of custody was necessary to serve B.R.'s best interest was not against the manifest weight of the evidence. Accordingly, the court did not err by granting respondent's motion to reconsider and transferring custody of B.R. to respondent.

¶ 64 As a final matter, we commend the trial court for persisting with this case to ensure that a just and proper result was ultimately reached. We also appreciate the court's detailed and thoughtful written orders, which we found very useful in our consideration of this appeal. This is especially true of the court's order granting respondent's motion to reconsider, in which the court candidly explained the error in its previous judgment and the reasons why a different judgment was necessary under a proper application of the law.

¶ 65                                    III. CONCLUSION
¶ 66        For the reasons stated, we affirm the trial court's judgment.

¶ 67        Affirmed.