**NOTICE**
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190807-U

NO. 4-19-0807

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 10, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the |
| AZZA ABDELKARIM, | ) | Circuit Court of |
|     Petitioner -Appellee, | ) | Champaign County |
|     and | ) | No. 11D248 |
| MAHER BAJIS, | ) | |
|     Respondent -Appellant. | ) | Honorable |
| | ) | Wm. Hugh Finson, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Knecht and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, holding the trial court's allocation of parenting time was not against the manifest weight of the evidence.

¶ 2    In October 2019, the trial court entered an amended order for parenting time, granting petitioner-wife (Azza) all decision-making responsibilities and allocating to her the majority of parenting time.

¶ 3    On appeal, respondent-husband (Maher) contends the trial court's order amending the allocation of parenting time was against the manifest weight of the evidence. Maher also claims the trial court erred by failing to mention his expert in its written order. We disagree and affirm the trial court.

¶ 4               I. BACKGROUND

¶ 5         Maher and Azza married on September 19, 2007. The marriage produced one child, Y.B., born in 2008. In April 2015, the trial court entered an agreed order granting joint custody to the parties and awarding Azza legal custody and decision-making abilities, and in December of that year, the court entered a dissolution of marriage between Maher and Azza. A year later, in December 2016, Azza moved to modify the allocation of parenting time between the parties, alleging a substantial change of circumstances; specifically, the minor child's visitation with Maher "may seriously endanger her physical, mental, moral, and emotional health." Azza claimed, in part, Maher made false accusations to the Department of Children and Family Services (DCFS), alleging several issues including physical abuse to Y.B. by Azza and Azza's husband, Maher had an unhealthy emotional enmeshment with Y.B., and had inappropriately interfered in the relationship between Y.B. and her therapist and between Y.B. and Azza.

¶ 6         In an affidavit, Y.B.'s therapist, Trevor Kendrick, stated she (Kendrick) previously had 67 sessions with Y.B., and she expressed concern about Maher and Y.B.'s relationship. She stated Maher has "boundary issues" with Y.B. and "treats her more like a life partner than a daughter." Kendrick opined Maher has an improper and unhealthy emotional enmeshment with Y.B. and has significantly interfered with the relationship between Y.B. and Azza. Kendrick believed Maher caused serious emotional, mental, and moral danger to Y.B. and it would be in Y.B.'s best interests to award Azza the majority of parenting time.

¶ 7         In February 2017, the trial court entered a temporary order awarding Azza the majority of the parenting time. This order was entered upon agreement by both parties. Maher's explanation in agreeing to grant Azza the majority of parenting time was that he thought it would only be for 120 days and "thought 120 days is a short time." Starting in September 2018 and

over the course of four nonconsecutive months and approximately nine separate hearings, the court heard testimony from Y.B.'s counselor, psychiatrists, expert witnesses, and police officers. The police officers testified about how they needed to be present during some of the custody exchanges and Maher's difficult behavior during the exchanges. Azza's husband testified about Maher's chronic tardiness when conducting the custody exchange and his acrimonious relationship with Maher.

¶ 8        A. The Hearings on Azza's Motion to Modify the Allocation of Parenting Time

¶ 9                    1. *Trevor Kendrick*

¶ 10        As the family therapist who held sessions with Y.B., Maher, and Azza, both individually and together, Kendrick testified about Maher's boundary issues. She stated she became alarmed after learning Maher would instruct Y.B. to speak negatively about Azza during the sessions and repeatedly attempted to negatively interfere with Azza and Y.B.'s relationship. Kendrick testified that Maher instructed Y.B. via text message not to show Azza any of his messages, thereby encouraging the negative relationship between her and Y.B. Kendrick described Maher and Y.B.'s relationship as "emotional incest" due to the "complete blurring of boundaries between parent and child." She elaborated how this goes beyond a parent loving his child because emotional incest is all about the parent's needs being met, not the child's. She testified this behavior is very damaging and can lead to long-lasting unhealthy relationships for the child. Y.B. told Kendrick she would get to choose who Maher dated, she was highly involved in communicating with his "multiple girlfriends," and she was allowed to go to his "massage sessions." He also promised he would not marry anyone else if Y.B. helped him get custody back. After summarizing the negative consequences of emotional incest for Y.B., Kendrick described it as "one of the most damaging things a parent can do to their child."

¶ 11                                    2. *Lawrence Jeckel*

¶ 12          Dr. Jeckel testified he relied on Maher's previous therapist and doctor's reports, including Kendrick's, to help formulate a mental assessment of Maher. At times, Maher was not taking his prescribed medications, which contributed to his mental health issues. His medical records also indicated a cannabis use disorder, as Maher was at times using cannabis on a daily basis. Maher admitted to cannabis use but claimed he used it only medicinally and never used it when he was with Y.B. However, Dr. Jeckel noted how cannabis use could negatively interfere with Maher's prescribed medication and treatment. Maher also previously pleaded guilty to domestic battery in 1997, which Dr. Jeckel found significant as another indicator of Maher's lack of impulse control. He also found it "strange" Maher claimed his post-traumatic stress disorder (PTSD) was not present when he was with Y.B. because, in his sessions, Maher seemed to be "edgy" and he has "never heard that a relationship would make PTSD symptoms go away." Dr. Jeckel noted Maher exhibited some signs of paranoia. For example, Maher expressed concern Azza and her husband were attempting to provoke him into doing something to jeopardize his parenting time, and Maher thought Dr. Jeckel was "going to deny him access to his daughter." Towards the end of Dr. Jeckel's report, he summed up his session with Maher, stating: "I was exhausted by the end of the two-hour session because I was forced to do the work of keeping the interview neutral in response to his paranoid, demanding, defensive posture." He diagnosed Maher with PTSD and borderline personality disorder with a disrupted personality and disrupted self-esteem system. Dr. Jeckel testified Maher had a "self-psychological bond that he uses to keep himself intact." He explained Maher views Y.B. as a distorted extension of himself, which accounts for his lack of boundaries with Y.B. According to Dr. Jeckel, Maher blurs boundaries so often with Y.B. that he "loses track of who's who," even though it is important for children to

keep their boundaries straight. Dr. Jeckel recommended Maher's parenting time be consistent with the previous temporary order, which granted the majority of parenting time to Azza.

¶ 13                                              3. *Karen Osgood*

¶ 14            Dr. Osgood testified she became Y.B.'s therapist after sessions between Y.B. and Kendrick were no longer feasible. Dr. Osgood testified she met with Y.B. approximately 10 times and administered an assessment of Y.B. based on self-reports from Y.B. Dr. Osgood reviewed several unfounded reports made by Maher or Y.B. to DCFS, alleging, on different occasions, physical abuse toward Y.B. by Azza or Azza's husband. Dr. Osgood stated Y.B. spoke with her in detail about ongoing issues between her parents but made no allegations against her step-father or Azza. Dr. Osgood recounted seeing spiteful text messages from Y.B. to her mother, stating Y.B. wished her mother "would die" and that she "was a horrible mother." Dr. Osgood learned Y.B. was with Maher when she sent these messages and this behavior contrasted with earlier sessions when Y.B. spoke very positively of her mother. Dr. Osgood stated, "I never once saw [Y.B.] express anything like that towards her mother" and "[I] wouldn't believe it was the same person." One text message from Y.B. to Azza read, "Daddy says the choice is always mine and I can choose to see my mother or father when I want." Dr. Osgood found this very concerning as this statement is contrary to delegation of parenting time in the court's temporary order and "creates false expectations as well as significant pressure on [the child]." Dr. Osgood also stated the five unfounded DCFS reports from Maher or Y.B. proved troubling because of the severity of the false accusations and because Y.B. never mentioned these allegations during any of their 10 sessions. She concluded Y.B. has a codependency with Maher. During their sessions, Y.B. related to Osgood that it is hard for her to separate from Maher because she really worries about how Maher is going to feel and is

concerned he might be lonely when she leaves. Dr. Osgood described this as an example of codependency that is not normal or healthy, especially for a 10-year-old child, and could have long-term effects on her future relationships. Osgood concluded she would have concerns if Maher received any additional parenting time.

¶ 15                                    4. *Luke Dalfiume*

¶ 16          The court also heard testimony from Maher's expert Dr. Dalfiume. Dr. Dalfiume is a clinical psychologist and testified he met with Maher, Y.B., Azza, and Azza's husband. He met with Y.B. approximately a dozen times. Y.B. told him she wanted to spend more time with her dad and is happier at his house. She was also concerned that any change in custody would not allow her to see Maher's family. He conducted two types of clinical tests which were completed by Maher and Azza for custody evaluations. He also administered tests on Y.B. and concluded the emotional closeness between Maher and Y.B. was much stronger than between Y.B. and Azza. He diagnosed Y.B. with different forms of anxiety and depression. He noted Maher, Azza, and Azza's husband all exhibited symptoms of histrionic personality disorder, in that all three like to have attention focused on them.

¶ 17          After several clinical interviews and tests with Azza, he concluded Azza attributes the relationship issues she has with Y.B. to Maher. He stated Maher responded openly during the interviews and Azza remained defensive. He said Maher is responsive to Y.B.'s needs, is likely to have his own needs met appropriately, and would not use Y.B. for the purpose of satisfying his own emotional needs. He diagnosed Maher as having generalized anxiety disorder and symptoms of histrionic personality disorder. Dalfiume concluded Y.B. appreciated her father's approach to parenting more than Azza's. He recommended the parenting time return to equal parenting time because "Maher is stable enough and has a positive relationship with [Y.B.]."

¶ 18        On cross-examination, he admitted some of the clinical tests he administered to Azza were not originally designed for non-native speakers of English, thereby affecting the sample used within the tests. He also admitted (1) some of the clinical tests administered were not originally designed to determine child custody and (2) he had received tens of thousands of dollars from Maher to perform his services.

¶ 19                            5. *Maher's Testimony*

¶ 20        Maher testified to some of the custody exchanges with Azza and her husband and to the tension between the parties during some of the exchanges. Maher testified to one occasion where Y.B. was placed in her step-father's car during a custody exchange, and he pulled away quickly after the exchange, running over Maher's foot and ankle. Maher claimed his former father-in-law got out of the car and began kicking him while on the ground, that Maher was taken away by an ambulance, and that he was scheduled to have surgery on his ankle due to the incident.

¶ 21        Maher further testified he has had three girlfriends since he and Azza separated and recounted at least two instances where Azza accosted his girlfriend in public. He testified he has been consistently receiving therapy and counseling. He requested the trial court split parenting time equally because he believed this would be better for Y.B.'s emotional health and well-being. On cross-examination, Maher admitted as of July 2018, he had paid his controlled expert, Dr. Dalfiume, approximately twenty thousand dollars. Additionally, he admitted to attempting to persuade Azza to purchase a firearm. He claimed he wanted her to have it for her protection but that he was not allowed to possess a firearm due to his PTSD. Cross-examination also revealed that Maher filed a lawsuit against the individual who was appointed by the court to conduct a home and background study and that Maher would provide massages to others within

his home while Y.B. was present. Further, Maher acknowledged that enmeshment means his love for Y.B. prevents her from loving other people and she would get jealous when he gave attention to others. Additionally, he admitted to his therapist he contemplated the possibility of giving up parental duties until his daughter is older.

¶ 22                                6. *Social Media and Text Messages*

¶ 23          Azza's counsel went through several of Maher's social media posts. These included a picture of Y.B. crying after he departed from her school after having lunch with Y.B. One post indicated Y.B. was being punished for loving him. Another post, presumably directed at Azza, stated, "you may have won the court order keeping [Y.B.] and I apart *** [but] I've already won in the only battlefield that matters, [Y.B.'s] heart and mine *** She already resents you and hates your abusive husband. You may have a court order, but I have her love and respect." Other posts requested some of his Facebook friends to speak up about the injustice being committed, that Azza and her husband were trying to keep Y.B. away from him because she's too attached (enmeshed) to Maher, and how it was "crazy" that a judge went along with it. He also described how Y.B. would sometimes make Instagram videos complaining about Azza and her husband when she was with him. Maher stated he would delete some of her videos but keep the ones that "make [Y.B.] feel empowered." Via text message, he would also "remind" Y.B. of things she may "want to mention" to the therapist before her therapy sessions. Further, there was evidence he sent Y.B. information on sports bras when she was eight years old, posted a picture of Y.B. in a swimsuit on social media, and a digital photo of Y.B. asleep in her bed in her underwear.

¶ 24                                B. The Trial Court's Ruling

¶ 25        In February 2019, the parties concluded the presentation of evidence. In April

2019, Azza and Maher supplied written closing arguments to the trial court. In October 2019, the

trial court issued an "Amended Order for Parenting Time," awarding Azza the majority of the

parenting time and granting her all decision-making responsibilities. Further, the order required

Maher to abstain from using cannabis during his parenting time and 12 hours prior to the

commencement of his parenting time, and to complete a program of counseling in dialectic

behavior treatment.

¶ 26        This appeal followed.

¶ 27                              II. ANALYSIS

¶ 28                            A. Parenting Time

¶ 29        Maher's argument on appeal is twofold: (1) the trial court's order modifying the

previous order and awarding the majority of parenting time to Azza was against the manifest

weight of the evidence and (2) the trial court's failure to mention Maher's expert testimony in its

order was arbitrary and against the manifest weight of the evidence. We disagree.

¶ 30        Under the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act),

section 610.5 addresses modifications to parenting time pertaining to minors in dissolution cases.

It states, in part:

> "Except in a case concerning the modification of any restriction of
>
> parental responsibilities under Section 603.10, the court shall
>
> modify a parenting plan or allocation judgment when necessary to
>
> serve the child's best interests if the court finds, by a
>
> preponderance of the evidence, that on the basis of facts that have
>
> arisen since the entry of the existing parenting plan or allocation

judgment or were not anticipated therein, a substantial change has occurred in the circumstances of the child or of either parent and that a modification is necessary to serve the child's best interests."

750 ILCS 5/610.5(c) (West 2016).

¶ 31   This court has previously stated that under the Dissolution Act, a party seeking a modification in parenting time must demonstrate there has been a substantial change in circumstances in order to request a modification pursuant to section 610.5(c) of the Dissolution Act. *In re Marriage of O'Hare*, 2017 IL App (4th) 170091, ¶ 28, 79 N.E.3d 712. This is so there is continuity in parenting plans and management with respect to the child. See *In re Marriage of Wycoff*, 266 Ill. App. 3d 408, 409-10, 639 N.E.2d 897, 900 (1994). According to the statute, before the court considers whether a modification is necessary to serve the child's best interest, the court must determine whether the movant has proved by a preponderance of the evidence a substantial change in circumstances has occurred based on facts that have arisen since the entry of the existing parenting plan or were not anticipated at that time. 750 ILCS 5/610.5(c) (West 2016). Accordingly, if the movant has met his or her burden of showing a substantial change in circumstances has taken place, then the court will address whether modification is necessary or appropriate based on the best interests of the child by considering the best interest factors set forth in section 602.7(b) to determine the best interests of the minor child concerning parenting time. See 750 ILCS 5/602.7(b) (West 2016). "Once the trial court has determined modification is required by clear and convincing evidence, the reviewing court will not disturb that decision unless it is contrary to the manifest weight of the evidence." *In re Marriage of Oros*, 256 Ill. App. 3d 167, 168, 627 N.E.2d 1246, 1248 (1994). It is not required to show harm has already occurred to demonstrate a substantial change is warranted to modify parenting time. The trial

court can modify custody among parties upon a showing that a change in circumstances has occurred which could lead to future harm or otherwise adversely affect the child's welfare. Such preemptive judicial action falls comfortably within the court's authority to modify custody "even if the child has yet to suffer the adverse effects of those changes." *In re Marriage of Rogers*, 2015 IL App (4th) 140765, ¶ 60, 25 N.E.3d 1213.

¶ 32        Here, the trial court's order did not specifically address whether Azza proved by a preponderance of the evidence that a modification was necessary due to a substantial change in circumstances. However, in its order, the trial court granted Azza a majority of parenting time after considering the evidence and weighing the best interest factors set forth in section 602.7(b) of the Dissolution Act. 750 ILCS 5/602.7(b) (West 2016). We can readily surmise since the trial court detailed, at length, 16 statutory best interest factors in its amended order for parenting time and applied them to the evidence presented, the trial court concluded a substantial change in circumstances had occurred before it undertook the time and effort to address each of the statutory factors in its order. Because modification of parenting time and the allocation of parenting time are subject to the same standard of review on appeal (contrary to the manifest weight of the evidence), we turn to the trial court's order and analyze the record to determine if the trial court's decision finding a substantial change in circumstances and allocation of parenting time were contrary to the manifest weight of the evidence presented.

¶ 33        Regarding parenting time, section 802(a) of the Illinois Parentage Act of 2015 (750 ILCS 46/802(a) (West 2016)), states the issue of parenting time is governed by the relevant portions of the Dissolution Act. Section 602.7(a) of the Dissolution Act (750 ILCS 5/602.7(a) (West 2016)) states the trial "court shall allocate parenting time according to the child's best interests." Section 602.7(b) (750 ILCS 5/602.7(b) (West 2016)), in turn, sets forth several

factors the court should consider when determining the child's best interests for purposes of allocating parenting time including, *inter alia*, the wishes of the parents and the child; the amount of time each parent spent performing caretaking functions in the 24 months preceding the filing of the petition for allocation of parental responsibilities; the interrelationship between the child and his or her parents and siblings; the child's adjustment to his or her home, school, and community; the child's needs; the distance between the parents' residences; the willingness and ability of each parent to place the needs of the child above his or her own needs; the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child; the mental and physical health of the individuals involved; and whether a restriction on parenting time is appropriate.

¶ 34        When deciding whether a modification of parenting time is appropriate, a change in circumstances must be material to the child's best interest to justify modification under the Dissolution Act. *Rogers*, 2015 IL App (4th) 140765, ¶ 57. A reviewing court will not disturb a trial court's decision to modify the terms of a custody agreement unless its decision is against the manifest weight of the evidence and constitutes an abuse of discretion. *In re Marriage of Debra N.*, 2013 IL App (1st) 122145, ¶ 45, 4 N.E.3d 78. An appellate court reviewing a trial court's conclusion that a change in child custody is necessary is not to try the case *de novo*, but rather, is to determine whether the trial court's decision is contrary to the manifest weight of the evidence. *In re Marriage of Melton*, 288 Ill. App. 3d 1084, 1088, 681 N.E.2d 1046, 1048 (1997). A judgment is against the manifest weight of the evidence "if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Best v. Best*, 223 Ill. 2d 342, 350, 860 N.E.2d 240, 245 (2006). Once the trial court concludes a change of custody is necessary, great deference must be accorded that decision; the trial court

alone is in the best position to judge the credibility of witnesses and determine the needs of a child or children. *Melton*, 288 Ill. App. 3d at 1087-88.

¶ 35    In its ruling, the trial court found six of the aforementioned statutory factors relevant and applicable to the present case, assessed them, and found all six factors favored Azza. We will address each applicable factor in turn.

¶ 36    Regarding the wishes of the child, taking into account the child's maturity and ability to express reasoned independent preferences, the trial court acknowledged Y.B. wants to spend as much time as possible with Maher. However, based on the evidence before it, the court found Maher had manipulated Y.B.'s opinion. Specifically, the trial court noted how Maher showed Kendrick's affidavit supporting Azza's motion to terminate equal parenting time to Y.B., which upset Y.B. and "completely sabotaged" the counseling relationship between Y.B. and Kendrick. Even though Kendrick established a rapport with Y.B. through approximately 67 sessions, a new counselor had to be found to continue Y.B.'s counseling sessions. Further, the evidence relied upon by the trial court for this factor included Maher telling Y.B. he would never remarry as long as Y.B. helped him get full custody, relaying the terms of the agreed upon temporary order to Y.B., fostering her anger towards Azza, allowing Y.B. to help him make adult decisions like picking out a house or which woman he should date, and Maher's "enmeshment" with Y.B. to such a degree it has created an unhealthy "emotional incest." Based on the evidence, the trial court concluded this factor does not favor Maher.

¶ 37    Regarding the child's needs, the trial court found Y.B.'s needs were very simple considering her age—"to be raised to be a healthy, well-adjusted adult." Evidence showed Maher's interactions with Y.B. caused her to feel "responsible for [Maher's] happiness," which at times alienated her from her mother and could lead to a long-term maladjustment, thus

- 13 -

interfering with her future relationships as she grows into adulthood. The evidence also showed Maher has very few boundaries with Y.B. and, consequently, he has involved her in adult and inappropriate decisions, including promising not to remarry if Y.B. helps him regain custody. Further, Maher would often think of a fun activity or trip he could undertake with Y.B. which would overlap in part with Azza's parenting time. Maher would then encourage Y.B. to ask Azza if she would agree, and if not, Azza would be viewed as the "bad guy" by prohibiting Maher and Y.B. from engaging in fun trips or activities. Wanting to spend time with one's 10-year-old daughter is healthy normal behavior. However, tasking her with the burden of being responsible for her father's happiness is not. The court concluded this factor favors Azza because Y.B. is not being raised the way she should due to Maher's "lack of boundaries, enmeshment or emotional incest and manipulation of [Y.B.]."

¶ 38        Regarding the mental and physical health of the individuals involved, the trial court found neither party suffered from any physical health issues. The court found Azza and her husband have some mental health issues, but these proved very minimal compared to Maher's, who suffers from PTSD, border-line personality disorder, and cannabis use disorder. Maher testified, however, he did not suffer any symptoms of PTSD while with Y.B.; this in spite of the testimony of Dr. Jeckel that in his professional experience he had never known PTSD to be situationally dependent upon who the person was with. Maher also said he did not smoke cannabis before or during visits with Y.B. Testimony indicated, however, Maher's cannabis use could interfere with his other prescribed medication, making him more unstable. His borderline personality disorder was characterized by "disrupted personality, a distorted view of the world and low self-esteem." The trial court referenced Maher's mental diagnosis and how it affected Y.B., noting how Maher involved Y.B. in adult related decisions. The court also highlighted

- 14 -

examples of Maher's boundary issues, including Maher posting photos of Y.B. in a swimsuit on social media, taking a picture of her asleep in her bed wearing underwear, asking her to bring over her "tight shorts," discussing what sports bras she should wear, and sharing inappropriate jokes with her on social media. There was also testimony indicating Maher's behavior could have a detrimental long-term impact on Y.B. because of an unhealthy codependency. The testimony indicated Y.B. worried about Maher being lonely and sad without her. Maher's mental health concerns have either intentionally or unintentionally resulted in Y.B. feeling responsible for her father's happiness. The trial court noted, regardless of Maher's parenting style, each one of these actions is "highly inappropriate" and found this factor favored Azza.

¶ 39        Regarding the parties' daily schedules and the ability of the parties to cooperate in the custody arrangement, the trial court found this favored Azza because of Maher's habitual tardiness in the custody exchanges. The testimony revealed Azza's husband began documenting when Maher arrived with Y.B. to facilitate the custody exchange. He testified Maher never arrived on time for any custody exchanges. Maher's tardiness ranged from being a couple minutes late to over 30 minutes late. In addition, the evidence before the court revealed that after arriving at the scheduled custody location with Maher, Y.B. would remain in Maher's car for several more minutes before finally departing and going with Azza or her husband. There was also evidence Maher would request additional time with Y.B. right before a scheduled custody exchange, prompting him to arrive late and causing further tensions between Y.B. and Azza if Azza refused the last-minute request for extra parenting time.

¶ 40        Concerning the willingness and ability of each party to place the needs of the child ahead of their own needs, the trial court found this factor favored Azza. Without doubting the love for his daughter and his genuine desire to be with her, the court found it was reasonable

- 15 -

to conclude, based on the evidence, Maher used his time with Y.B. to meet his needs, *i.e.*, fostering his own happiness and alleviating his own emotional and mental issues. Indeed, the court stated Maher's actions were "intended to enable him to be with [Y.B.] as much as possible, regardless of the consequences of those actions on [Y.B.'s] emotional growth and development." The court again noted how Y.B. felt responsible for Maher's happiness and worried about him when she was not around him.

¶ 41 The final factor the trial court found relevant was the willingness and ability of each parent to help facilitate and encourage a close relationship between the child and the other parent. Here, there was evidence Maher intentionally engaged in actions that fostered Y.B.'s resentment toward Azza. The evidence before the court included Maher consistently telling Y.B. about the court's proceedings, including Azza's motion to terminate joint custody and Kendrick's affidavit in support of Azza's motion. This soured not only Y.B.'s relationship with her mother but also damaged the close relationship between Y.B. and her therapist, who held almost 70 appointments with her. Further, the evidence presented demonstrated Maher would encourage Y.B. to make false accusations about Azza to Kendrick and false complaints about Azza's husband to DCFS. DCFS did not deem these allegations credible, and Y.B. confirmed these allegations were false and apologized to Azza's husband during a joint therapy session. As was mentioned previously, there was evidence of Maher purposely proposing trips or activities cutting into Azza's time, placing her in the position of either consenting or being viewed as bad for not allowing the additional time. Based on this evidence, the court's finding that this factor favored Azza was not against the manifest weight of the evidence.

¶ 42 Based on the record and the reasoning provided by the court in its written order, we cannot find the trial court's decision was against the manifest weight of the evidence (*Debra*

- 16 -

*N.*, 2013 IL App (1st) 122145, ¶ 45), or that an opposite result of the trial court's order is clearly evident from the record (*In re Marriage of Betsy M.*, 2015 IL App (1st) 151358, ¶ 61, 46 N.E.3d 373). Further, we will not disturb the trial court's decision to modify a previous order concerning the allocation of parenting time "unless it is contrary to the manifest weight of the evidence." *Oros*, 256 Ill. App. 3d at 168. Having failed to so find, we affirm.

¶ 43                                    B. Maher's Expert

¶ 44        Maher's second claim is that the trial court's failure to mention Maher's expert or his report is somehow evidence of the court's decision being arbitrary. While making this claim, Maher also acknowledges the trial court is not bound to accept the recommendations and opinions of any particular expert witness. However, contrary to Maher's assertion, the court did refer to some of his expert's opinions indicating Azza, her husband, and Maher all suffered from "some mental health issues." Dr. Dalfiume found both Azza and her husband to exhibit features and symptoms of histrionic personality disorder. Additionally, as the fact finder, the trial court is permitted to give as much or as little weight to Maher's expert's testimony as it finds appropriate. The "testimony of an expert witness is not to be accepted as truth *per se*, but must be judged as to weight and credibility by the same rules applicable to other witnesses." *Racky v. Belfor USA Group, Inc.*, 2017 IL App (1st) 153446, ¶ 112, 83 N.E.3d 440 (citing *Morus v. Kapusta*, 339 Ill. App. 3d 483, 492, 791 N.E.2d 147, 155 (2003)). The court also heard evidence that Maher's controlled expert received tens of thousands of dollars from Maher and may well have concluded this cast some doubt on his opinion and credibility; however, we need not speculate on the trial court's credibility determinations since those are left to the discretion of the fact finder. *Racky*, 2017 IL App (1st) 153446, ¶ 107. Although Maher's expert did find Y.B. wanted to spend more time with Maher, the trial court provided reasons why it did not give her

declarations significance; Maher's consistent manipulation and boundary issues distorted Y.B.'s perception of her mother and, consequently, how she relayed her preferences to Maher's expert.

¶ 45        This court defers "to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and witnesses." *Best*, 223 Ill. 2d at 350. "A reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given to the evidence, or the inferences to be drawn." *Best*, 223 Ill. 2d at 350-51. Here, we cannot conclude the opposite result is clearly evident from the record. The trial court was free to determine which, if any, experts were credible or persuasive, and there is nothing in the written order indicating it did not do so. Maher would have us draw a negative inference against the propriety of the trial court's ruling based solely upon a failure to mention his expert by name or specifically reference his report with attribution. The court, by failing to mention Maher's expert witness by name, either did not give his testimony much weight or, when weighed against the testimony of the other experts, did not find it particularly compelling. As the trial court is in the best position to judge the credibility of witnesses and weigh the evidence, this court will not disturb that determination.

¶ 46                          III. CONCLUSION

¶ 47        For the reasons stated, we affirm the trial court's judgment.

¶ 48        Affirmed.